Cory R. Laird
Lindsay A. Mullineaux
Riley M. Wavra
LAIRD COWLEY, PLLC
P.O. Box 4066
Missoula, MT 59806-4066
Telephone:   (406) 541-7400
Email:       claird@lairdcowley.com
             lmullineaux@lairdcowley.com
             rwavra@lairdcowley.com

Mark M. Kovacich
Ben A. Snipes
Caelan G. Brady
KOVACICH SNIPES JOHNSON PC
21 3rd Street North, Suite 301
Great Falls, MT 59401
Telephone:   (406) 500-5000
Email:       mark@justicemt.com
             ben@justicemt.com
             caelan@justicemt.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JEFF BECK, individually; AMY WEINBERG, individually; ZAC WEINBERG, individually; ALTA VIEWS, LLC; RIVERVIEW COMPANY, LLC; and on behalf of a class of similarly situated persons and entities,<br><br>     Plaintiffs,<br><br> vs.<br><br>CITY OF WHITEFISH, a Montana municipality, and DOES 1-10,<br><br>    Defendants. | CV-2022-44-M-KLD<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CLASS CERTIFICATION MOTION** |

1

CITY OF WHITEFISH, a Montana
municipality,

              Third-Party Plaintiff,

    vs.

FINANCIAL CONSULTING
SOLUTIONS GROUP, INC.,

             Third-Party Defendant.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................2

TABLE OF AUTHORITIES ................................................................................3

EXHIBIT INDEX ................................................................................................5

ARGUMENT ......................................................................................................5

  I.  The Class includes all persons who owned properties and bore the cost of the City's water or wastewater impact fees under rates effective January 1, 2019, to the present. ..................................................................................................5

  II.  All Class members have standing. ..............................................................7

    A.  Standing must be determined without examining § 1603(1)(c). ...............7

    B.  Section 1603(1)(c) requires payment of refunds to the person that owned the property at the time the impact fees were unlawfully collected.........10

  III.  The Class's claims are timely........................................................................15

    A.  Plaintiffs' § 1983 claims are timely. ........................................................16

    B.  Plaintiffs' state law claims are timely. .....................................................19

  IV.  Due to the City's uniformity in assessing and administering impact fees, common questions heavily predominate in this action. .................................22

    A.  The entire Class suffered the same harm and have the same claims arising from the same set of operative facts........................................................22

    B.  There are no difficulties in managing the claims at issue on a Class-wide basis. ..........................................................................................................24

V.  The Opposition's arguments against superiority and numerosity are disingenuous and meritless. ..................................................28

   A.  The City's "voluntary resolution" of the fixture count issue is an inadequate remedy. ....................................................................28

   B.  The City's administrative appeal process is inadequate for vindication of the Class's constitutional rights. ..............................................29

   C.  Joinder of all Class members is impractical. ...........................30

CONCLUSION ..................................................................................31

CERTIFICATE OF COMPLIANCE ........................................................32

## <u>TABLE OF AUTHORITIES</u>

**Constitutional Provisions:**

U.S. Const. amend XIV ...................................................................8
U.S. Const. amend. V ......................................................................8

**Federal Cases:**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)...........................6
*Armstrong v. U.S.*, 364 U.S. 40 (1960)...............................................8
*Beck v. City of Whitefish*, 2023 WL 1068239 (D. Mont. 2023) ...........8, 9
*Burnett v. Grattan*, 468 U.S. 42 (1984) .........................................16, 31
*California Sea Urchin Comm'n v. Bean*, 883 F.3d 1173 (9th Cir. 2018)..............7
*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ..........................14, 24, 28
*First Nat. Bank in Billings v. First Bank Stock Corp.*,
   197 F. Supp. 417 (D. Mont. 1961)...............................................18
*Harvey v. Pomroy*, 535 F.Supp. 78 (D. Mont. 1982) ............................17
*Heck v. Humphrey*, 512 U.S. 477 (1994).........................................16
*Knick v. Township of Scott, Pa.*, ___ U.S. ___, 139 S.Ct. 2162 (2019) .......9, 16, 30
*Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ......................8
*Owens v. Okure*, 488 U.S. 235 (1989) ..............................................16
*Pakdel v. City and Cty. of S.F., Cal.*, ___ U.S. ___, 141 S.Ct. 2226 (2021)..........30
*Ray Charles Found. v. Robinson*, 795 F.3d 1109 (9th Cir. 2015)...........................9
*U.S. v. Crusell*, 81 U.S. 1 (1871) ...................................................18
*Wang v. Chinese Daily News*, 737 F.3d 538 (9th Cir. 2013)....................22

*Wilson v. Garcia*, 471 U.S. 261 (1985) ...................................................16
*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) .....................6

**State Cases:**

*Belanus v. Potter*, 394 P.3d 906 (Mont. 2017) ........................................22
*Bostwick Props., Inc. v. Dept. of Nat Res. & Conserv.*,
    296 P.3d 1154 (Mont. 2013)...................................................... 11, 14
*Carl v. Chilcote*, 844 P.2d 79 (Mont. 1992) ...................................... 19, 21
*Clark Fork Coal. v. Dep't of Nat. Res. & Conservation*,
    481 P.3d 198 (Mont. 2021).......................................................15
*Desoto Wildwood Dev., Inc. v. City of Lewisville*,
184 S.W.3d 814 (Tex. App. 2006)..............................................12
*Houston Lakeshore Tract Owners Against Annexation v. City of Whitefish*,
    391 P.3d 86 (Mont. 2017)........................................................11
*In re A.R.R.*, 919 P.2d 388 (Mont. 1996).............................................15
*K.L.N Constr. Co. v. Town of Pelham*, 107 A.3d 658 (N.H. 2014)........................12
*Maier v. State*, 69 P.3d 1194 (Mont. 2003) ..........................................14
*Raintree Homes Inc. v. Vill. of Long Grove*, 807 N.E.2d 439 (Ill. 2004)...............13
*Town of Londonberry v. Mesiti Dev. Inc.*, 129 A.3d 1012 (N.H. 2015).................12

**Statutes:**

42 U.S.C. § 1983 ............................................................... passim
Mont. Code Ann. § 26-1-602 ....................................................18
Mont. Code Ann. § 27-2-102 ....................................................22
Mont. Code Ann. § 27-2-202 ....................................................22
Mont. Code Ann. § 27-2-204 ................................................ 17, 22
Mont. Code Ann. § 27-2-207 ................................................ 19, 22
Mont. Code Ann. § 27-2-209 ................................................ passim
Mont. Code Ann. § 7-6-1602 ................................................ passim
Mont. Code Ann. § 7-6-1603 ................................................ passim
Tex. Loc. Gov't Code Ann. § 395.025 ...........................................12

**Rules:**

Fed. R. Civ. P. 23 .................................................................6

**Other Authorities:**

Whitefish City Code § 10-2-6..................................................30

## EXHIBIT INDEX

Exhibit 1
   Sept. 20, 2021 Meeting Minutes of the Whitefish City Council ..........................18
Exhibit 2
   Sept. 20, 2021 Excerpt from the City Council Meeting packet...........................18
Exhibit 3
   Water & Wastewater Impact Fee Invoice for 754 Cottonwood Court................23
Exhibit 4
   Addendum to "Impact Fee Update" ...................................................................26
Exhibit 5
   Whitefish Impact Fees Frequently Asked Questions ..........................................29

COME NOW Plaintiffs, and respectfully submit their Reply Brief in Support of Class Certification Motion.

## ARGUMENT

**I.    The Class includes all persons who owned properties and bore the cost of the City's water or wastewater impact fees under rates effective January 1, 2019, to the present.**

In their class certification motion, Plaintiffs asked the Court to define the Putative Class ("Class") as: "Any and all persons or entities who paid impact fees for water and wastewater services to Defendant City of Whitefish ('the City') from January 1, 2019, to the present." (Doc. 39 at 2.)  The City and Third-Party Defendant Financial Consulting Solutions Group, Inc. ("FCS") (collectively the "Opposition") interpret this definition as encompassing anyone who transmitted impact fee payments to the City after January 1, 2019.  This is incorrect.

While some impact fee payments may have been delivered to the City by third parties on behalf of property owners, the Class encompasses any property owner who actually bore the cost of improperly assessed impact fees. Put another way, the Class includes <u>all persons or entities who owned properties for which they bore the cost of impact fees paid to the City for water or wastewater services under rates effective January 1, 2019, to the present.</u> Aside from the City and a handful of others who paid fees under pre-2019 rates, this Class includes, but is not limited to, everyone identified in the list attached to Plaintiffs' opening brief. (Doc. 40-3). If the City's impact fee scheme violates the Constitution and Montana law, the Class members are entitled to the damages claimed in this case.

Regardless, the Court's grant or denial of Plaintiffs' motion does not turn solely on the Class definition offered in their opening brief. On the contrary, if the Court determines Plaintiffs' proposed definition needs tailoring, it may adopt one with different language. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (A "trial court has broad discretion to certify a class, [if] exercised within the framework of Rule 23"). With this in mind, class action procedure is specifically designed for class flexibility, even after an initial certification order. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997) (Baked into Rule 23's procedure is "the [Court's] opportunity to adjust the class as litigation unfolds."); Fed. R. Civ. P. 23 (c)(1)(C) ("An order that grants or denies

class certification may be altered or amended before final judgment.").  Plaintiffs

seek certification of the class of persons actually harmed by the City's unlawful

conduct.  As such, the Court should adopt an appropriate definition of the individuals

or entities comprising that group, even if it takes issue with Plaintiffs' proposed

definition.

## II.    All Class members have standing.

The Opposition contends some Class members lack standing.  This is not true.

To possess Article III standing, a person must have: (1) suffered a concrete and

particularized injury in fact; (2) fairly traceable to the defendant's actions; (3) that

can be "redressed by a favorable decision."  *California Sea Urchin Comm'n v. Bean*,

883 F.3d 1173, 1180 (9th Cir. 2018).  The Opposition does not specifically challenge

application of any of these elements.  Instead, the crux of the Opposition's standing

argument is that some of the Class members lack standing because they are ineligible

for impact fee refunds under Mont. Code Ann. § 7-6-1603(1)(c) (2021) ("§

1603(1)(c)").  As explained below, not only is the Opposition's interpretation of §

1603(1)(c) improper, but that statute has no bearing on a standing analysis in this

case.

### A. Standing must be determined without examining § 1603(1)(c).

The Class seeks to bring monetary damage claims for: (1) violation of 42

U.S.C. § 1983 ("§ 1983"); (2) negligence *per se*; (3) negligence; and (4) negligent

misrepresentation.  (*See generally* Doc. 1.)   The Class's entitlement to damages for these claims does not rise or fall on application of § 1603(1)(c).

Consider the Class's § 1983 claim, for example.   The Fifth Amendment (rendered binding on the states through the Fourteenth Amendment) forbids the government from forcing private property owners "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. U.S.*, 364 U.S. 40, 49 (1960).  In the monetary exactions context, a taking occurs when the government conditions land-use permits on monetary payments without "an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property."  *Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 614 (2013).

The injury-in-fact necessary to confer standing occurs, of course, at the time an unconstitutional taking occurs.  *Koontz* confirms this understanding, providing the type of constitutional injury complained of in this case is suffered by the property owner whose desired land use is extortionately conditioned on payment of arbitrary or disproportionate fees.   570 U.S. at 607.  This Court has recognized as much, stating, "in this case, Plaintiffs allege that, in conditioning grants of building permits on the payment of excessive impact fees grossly disproportionate to the actual impact of proposed developments, the City has subjected Plaintiffs to deprivations

of their rights under the Fifth Amendment." *Beck v. City of Whitefish*, 2023 WL 1068239, at *5 (D. Mont. 2023).

This presents "a cognizable violation of the Takings Clause." *Beck*, 2023 WL 1068239, at *6. And, if successful, the remedy is monetary damages, without examination of § 1603(1)(c). *See Knick v. Township of Scott, Pa.*, ___ U.S. ___, ____, 139 S.Ct. 2162, 2177 (2019) (holding that a takings violation may be "remedied by monetary damages" obtained under "§ 1983" and "is complete at the time of the taking," regardless of any "subsequent state action"). In other words, the Class does not need to be eligible for a "refund" from the City pursuant to § 1603(1)(c) to receive damages for an unconstitutional taking. This analysis applies with equal force to the Class's remaining causes of action seeking monetary damages under state law tort theories which may be awarded irrespective of any refund provision found in § 1603(1)(c).

Oddly, it is exactly who the Opposition claims is eligible for refunds—people who currently own affected properties but who did not own such properties at the time the unlawful impact fee collections occurred—that would lack standing to prosecute the claims at issue in this case. *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1118–19 (9th Cir. 2015) (explaining general rule that a party "cannot rest his claim to relief on the rights or interests of third parties," but must instead "assert his own legal rights and interests"). If a current owner did not bear the cost of the

unlawful impact fee then they cannot advance the constitutional claim of the previous owner that did.  *Id.*  Regardless, as explained below, § 1603(1)(c) requires that refunds be paid to the Class members, whether they currently own the impacted properties or not.

### B. Section 1603(1)(c) requires payment of refunds to the person that owned the property at the time the impact fees were unlawfully collected.

Montana law authorizes local governments to charge impact fees if they are established, calculated, imposed, and collected in accordance with enumerated criteria and limitations.  *See* Mont. Code Ann. § 7-6-1602.  In Montana, impact fee amounts must be reasonably related and proportionate to a development's share of the cost of the infrastructure improvements.  Mont. Code Ann. § 7-6-1602(7)(a)-(b).  Notably, Montana's impact fee statute provides a refund mechanism for improperly charged impact fees, stating:

> If the impact fees are not collected or spent in accordance with the impact fee ordinance or resolution or in accordance with 7-6-1602, any impact fees that were collected must be refunded to the person who owned the property at the time that the refund was due.

Mont. Code Ann. § 7-6-1603(1)(c).  Because the refund becomes due at the time the impact fees are improperly assessed, § 1603(1)(c) requires that refunds be paid to the owners that were improperly charged.  Montana's principles of statutory interpretation confirm this.

The most important step in statutory interpretation is to "ask whether the interpretation reflects the intent of the legislature considering the plain language of the statute." *Bostwick Props., Inc. v. Dept. of Nat Res. & Conserv.*, 296 P.3d 1154, 1159 (Mont. 2013). "In the search for plain meaning, the language used must be reasonably and logically interpreted, giving words their usual and ordinary meaning." *Houston Lakeshore Tract Owners Against Annexation v. City of Whitefish*, 391 P.3d 86, 89 (Mont. 2017).

To reach a logical plain language interpretation, it is necessary to determine exactly when § 1603(c) applies. By its plan language, this provision is triggered when "impact fees are not collected . . .in accordance with . . . [§] 7-6-1602." That statute sets forth the criteria that governmental entities "must comply with" when collecting impact fees in Montana. So, if a governmental entity unlawfully assesses and collects impact fees under § 7-6-1602, § 1603(1)(c)'s refund provision, by its own terms, is triggered. Once § 1603(1)(c) is triggered, its plain language requires "any impact fees that were collected . . . be refunded." Accordingly, when impact fees are unlawfully assessed and collected, a governmental entity has an obligation to refund the unlawfully collected fees, and the intended recipient of the refund is "the person who owned the property at the time that the refund was due." Put simply, "[t]he time a refund was due" is just another way to describe the moment an obligation to refund arose.

If the City has no legal right to the impact fees it collects, a refund is due the second it is collected. Ironically, the Opposition accuses Plaintiffs of inserting language into § 1603(1)(c) that is not there, yet that is exactly what their interpretation does. If, as the Opposition suggests, refunds are truly due when they are discovered or adjudicated as unlawful, the legislature would have simply written that refunds go to the "current property owner" or "the property owner at the time that the refund is paid" or even "the property owner at the time a court determines there was an overcharge." However, § 1603(1)(c) includes none of this language.

Contrary to the City's contentions, there is significant legal authority supporting Plaintiff's interpretation—the literal plain language of § 1603(1)(c). In contrast, the Opposition's authorities do not actually support its § 1603(1)(c) interpretation because none deal with the same statutory language or circumstances at issue here. *K.L.N Constr. Co. v. Town of Pelham*, 107 A.3d 658 (N.H. 2014) and *Town of Londonberry v. Mesiti Dev. Inc.*, 129 A.3d 1012 (N.H. 2015) both dealt with "entitlement to a refund of *legally assessed*, but unspent or unencumbered, impact fees." *Town of Londonberry*, 129 A.3d at 1016 (emphasis added). The Texas statute at issue in *Desoto Wildwood Dev., Inc. v. City of Lewisville*—which the Opposition describes as "similar" to § 1603(1)(c)—*specifically* required refunds "be made to the record owner of the property at the time the refund is *paid*." 184 S.W.3d 814, 821 (Tex. App. 2006) (emphasis added) (quoting Tex. Loc. Gov't Code Ann. §

12

395.025(e)).  Finally, the Court in *Raintree Homes Inc. v. Vill. of Long Grove* did not interpret any statutory language but rather considered a builder's standing to seek refund of impact fees delivered to a local government for a particular lot when the builder specifically testified to transferring that cost to the lot owner, increasing the contract price by the exact amount of impact fees paid.  807 N.E.2d 439, 447-48 (Ill. 2004).

Here, Plaintiffs challenge the constitutional and legal deficiencies within the City's calculation, assessment, and ultimate collection of impact fees.  (*See generally*, Doc. 1.)  Even Plaintiffs' allegations concerning "phantom, ineligible, and improperly calculated" projects contend these projects could not "be lawfully included in calculating appropriate impact fee rates" in the first place.  (Doc. 1 at ¶¶ 29, 32.)  In short, these projects should have never been part of its impact fee charges.  When the City's fee rates were determined, the projects were either ineligible for inclusion as unrelated to development impacts or far too preliminary to genuinely reflect "reasonable estimates of the cost to be incurred by the governmental entity as a result of new development."  (*See* Doc. 1 ¶¶ 58-59 (citing Mont. Code Ann. §§ 7-6-1602(5), (7)).)

Impact fees collected to pay for such projects identified in Plaintiffs' allegations were not collected in accordance with § 7-6-1602 and should never have been collected in the first place.  The City's decision to abandon a project has nothing

to do with when a refund is actually due. Instead, abandoned projects merely bolster Plaintiffs' argument that the City had no genuine, reasonable basis for believing such projects were "made necessary by . . . new development." Mont. Code Ann. § 7-6-1602(7)(a). The City could not abandon truly necessary projects without affecting its ability to allow future development. For example, the City has abandoned the Solar Array project, yet development within the City remains uninhibited by this decision. Accordingly, the Opposition's suggestion that the logical, plain meaning interpretation of § 1603(1)(c) does not square with Plaintiffs' allegations misconstrues Montana law, Plaintiffs' allegations, or both.

Another important step in the interpretative process is to "examine whether the interpretation comports with the statute as a whole." *Bostwick Props., Inc.*, 296 P.3d at 1159. "Indeed, statutes do not exist in a vacuum, [but] must be read in relationship to one another to effectuate the intent of the statutes as a whole." *Maier v. State*, 69 P.3d 1194, 1197 (Mont. 2003). Interpreting § 1603(1)(c) within the greater context of Montana's impact fee statutory scheme, it is clear the legislature intended for refunds to be returned to the property owners who were charged unlawful impact fees, consistent with the constitutional implications of monetary exactions.

For starters, the "reasonable relationship" and "proportionate share" language of § 7-6-1602 both track the essential nexus/rough proportionality constitutional

standard applicable to government exactions. *See Dolan v. City of Tigard*, 512 U.S. 374, 390-91 (1994) (discussing the "reasonable relationship test" adopted by a majority of state courts). "The Legislature is presumed to be aware of all of its enactments as well as all related constitutional duties and limitations." *Clark Fork Coal. v. Dep't of Nat. Res. & Conservation*, 481 P.3d 198, 222 (Mont. 2021). As already discussed, the constitutional concern of the Takings Clause is a property owner's rights *at the time* a government takings occurs. Montana's impact fee statutes, on the whole, clearly illustrate legislative intent for government entities to comply with their constitutional obligations in assessing and collecting impact fees.

When viewed in this context, § 1603(1)(c)'s place in Montana's impact fee framework is to provide an alternative remedial mechanism for rectifying injuries suffered by the public due to a local government's unlawful actions. The injury, of course, is inflicted on the person who bears the cost of the fee, not a subsequent owner. Because "it is paramount" a court interprets statutes to preserve constitutional rights, *In re A.R.R.*, 919 P.2d 388, 391 (Mont. 1996), § 1603(1)(c) must be read to establish refunds are due at the time the impact fees are lawfully charged. Consequently, presuming § 1603(1)(c) bears on the Class's standing, its plain meaning requires that refunds be paid to the owner of the property aggrieved by the unlawful action giving rise to the refund.

**III.    The Class's claims are timely.**

As a matter of law, Mont. Code Ann. § 27-2-209(5)'s six-month limitations period is inapplicable to the claims in this action.  As such, the Class's claims are timely.

### A. Plaintiffs' § 1983 claims are timely.

Under binding Supreme Court precedent, *any* claims brought under § 1983 must borrow the applicable state's tort statute of limitations.  *Wilson v. Garcia*, 471 U.S. 261, 271-76 (1985).  When a state has multiple statutes of limitations for certain enumerated torts and a residual statute for all other tort actions, the residual statute of limitations applies to *all* § 1983 claims.  *Owens v. Okure*, 488 U.S. 235, 236 (1989).  A short statute of limitations—like the six-month limitation found at § 27-2-209(5)—is inappropriate in federal civil rights litigation because it "ignores the dominant characteristic of civil rights actions: they belong in court."  *Burnett v. Grattan*, 468 U.S. 42, 50 (1984).

The Opposition's suggestion that § 27-2-209 somehow applies to the Class's § 1983 claims is simply unfounded.  Section 1983 "guarantees 'a federal forum for claims of unconstitutional treatment at the hands of state officials,'" and takings plaintiffs have no less of a right to the federal forum than any other § 1983 claimant.  *Knick*, 139 S.Ct. at 2167 (quoting *Heck v. Humphrey*, 512 U.S. 477, 408 (1994).  Accordingly, the only aspect of state law borrowed in adjudicating Plaintiffs' § 1983 claims is Montana's general tort statute of limitations.

Montana's general tort statute of limitations is three years.  Mont. Code Ann. § 27-2-204(1).  Additionally, "[a]lthough federal courts borrow state statutes of limitation in actions arising under 42 U.S.C. [§] 1983, the date on which the cause of action accrues is determined by federal standards.  The time of accrual under federal law is when the plaintiff knows or has reason to know of the injury which is the basis for the action under 42 U.S.C. [§] 1983." *Harvey v. Pomroy*, 535 F.Supp. 78, 81 (D. Mont. 1982).  Accordingly, Plaintiffs' § 1983 claims are not barred if brought within three years of when they knew or had reason to know of the constitutional deficiency of the City's impact fees.

Plaintiffs did not know or have reason to know the impact fees the City demanded of them were unrelated to or unattributable to their proportionate share of the cost of infrastructure improvements made necessary by development until a private Whitefish citizen, Paul Gillman, performed an extensive factual investigation into the evidence the City had for: (1) the impacts of development on public water and wastewater facilities in the City; (2) the capacity, cost, and other features of infrastructure improvements the City had "planned" for the future; and (3) the validity of certain processes, e.g., counting fixture units, the City used in administering impact fees.

During his investigation, Mr. Gillman requested information and documents from the City and discovered a plethora of potential issues with the City's impact

fee rates and fee administration.  The results indicated the City's fees greatly exceed *any* development's actual proportionate share of costs for necessary infrastructure improvements.  Mr. Gillman presented his findings to the City in the fall of 2021, and the City admitted to assigning the wrong fixture unit weighting factor to standalone showers but denied there was any validity to the rest of Mr. Gillman's findings.  The first public mention of Mr. Gillman's investigation occurred at a September 20, 2021 public meeting of the Whitefish City Council where City Council members declined to address or further look into Mr. Gillman's findings outside of the standalone shower fixture unit issue.  (*See* Sept. 20, 2021 Meeting Minutes of the Whitefish City Council attached hereto as Exhibit 1 at 6-7; Sept. 20, 2021 Excerpt from the City Council Meeting packet attached hereto as Exhibit 2; *see also* Doc. 75-11 at 1-2.)

Legally, "[t]here is a well[-]recognized presumption that a public officer has performed his legal duty and that his proceedings are regular and legal."  *First Nat. Bank in Billings v. First Bank Stock Corp.*, 197 F. Supp. 417, 424-25 (D. Mont. 1961) (citing *U.S. v. Crusell*, 81 U.S. 1, 4 (1871)).  In Montana, this presumption is codified.  *See* Mont. Code Ann. § 26-1-602(15) (There is a disputable evidentiary presumption that "[o]fficial duty has been regularly performed.").  Just like anyone else, Class members were entitled to presume City officials had legally performed their duties and determined impact fee rates reasonably related and proportional to

18

their developments' impacts on the City's public facilities, in accordance with the Constitution and Montana law.

Mr. Gillman's investigation into the City's impact fee rates went well beyond the reasonable exercise of diligence expected of members of the general public who paid fees the City required to develop property. Plaintiffs did not know or have reason to know of certain facts giving rise to their injuries until Mr. Gillman presented the public with evidence controverting their justified presumption that the City dealt with them legally, prompting Plaintiffs to undertake their own investigation, revealing their entitlement to redress for constitutional and legal harm. Accordingly, Plaintiffs did not know or have reason to know of their injuries at least September 20, 2021. Plaintiffs brought their § 1983 claim to this Court on February 24, 2022, well within the requisite three-year period from their actual or constructive knowledge of injury.

**B. Plaintiffs' state law claims are timely.**

Section 27-2-209(5)'s six-month statute of limitations applies when a property owner seeks to overturn a municipality's denial of a proposed land use. The Montana Supreme Court has applied much longer limitations periods in cases involving a municipality's duties to a property owner arising subsequent to a land use decision. *See Carl v. Chilcote*, 844 P.2d 79, 83 (Mont. 1992) (applying Mont. Code Ann. § 27-2-207's two-year statute of limitations to a plaintiff's claims against

the City of Missoula for negligence in supervising and inspecting a construction project it had permitted).

Here, Plaintiffs' state law claims sound in negligence and arise out of the City's breach of the duties it owed to Plaintiffs and the intended Class members in its assessment and collection of impact fees. *See generally* (Doc. 1 ¶¶ 51-79). When the City assessed impact fees on development within its jurisdiction, it assumed certain duties specific to that undertaking, including a continuing duty to refund any fees it unlawfully collects. Plaintiffs are not seeking to overturn the City's decisions to permit the development of their properties. Instead, Plaintiffs request relief in the form of "compensation for the unlawful, unconstitutional, and improper impact fees" they and the Class bore, consistent with the City's obligation to refund under § 1603(1)(c). (*See* Doc. 1 ¶ 4).

Here, the Opposition failed to cite any applicable authority to support its contention that Mont. Code Ann. § 27-2-209(5)'s six-month statute applies to the Class's claims. The imposition of an exaction is different from a traditional "land use decision." With the former, the government permits a land use upon its receipt of property (such as money) instead of simply deciding whether to permit or deny the use. With respect to the latter, the government has no continuing constitutional duties to a property owner once it decides to allow the proposed use.

20

With exactions, even after a permit is issued, the government may still have a constitutional duty to provide just compensation for what it received from the property owner if the exaction fails to meet the essential nexus/rough proportionality standard. Constitutionally, the government cannot just keep the property it collected without returning the unconstitutional excess. These constitutional considerations associated with exactions are exactly what the refund mechanism provided for in § 1603(1)(c) contemplates and what § 27-2-209(5)'s short statute of limitations does not.

After impact fees are paid and a permit is issued, § 27-2-209(5) no longer applies—there is no "written decision" on a "land use, construction, or development project" for a court to review, and the property owner is free to move forward with the project. Still, a municipality's duties to the property owner may persist, and, just as in *Carl*, when a property owner seeks redress for a municipality's failure to uphold its duties beyond merely saying "yes" or "no" to a proposed land use, the land use statute of limitations becomes inapplicable.

Montana's impact fee statutes provide no statute of limitations within which a plaintiff is to bring claims for refunds of unlawfully collected impact fees. Section 1603(1)(c) certainly puts "an obligation or liability, other than a contract, account, or promise, not founded upon an instrument writing" on a local government to refund such fees, to which § 27-2-202(3)/§ 27-2-204(1)'s three-year limitations period

applies.  Consistent with § 1983 claims, constitutional torts in Montana "are subject to the three-year statute of limitations set forth in § 27-2-204(1)," Montana's general tort statute.  *Belanus v. Potter*, 394 P.3d 906, 910 (Mont. 2017).  At the very least, the applicable period might be two years from discovery of the facts constituting Plaintiffs' claims under Montana's statute of limitations for injury to real or personal property.  Mont. Code Ann. §§ 27-2-207 (1), 27-2-102(3).   As discussed, Plaintiffs brought their state claims to this Court on February 24, 2022, well within any potentially applicable limitations period from their actual or constructive knowledge of injury on September 20, 2021.

## IV.   Due to the City's uniformity in assessing and administering impact fees, common questions heavily predominate in this action.

Because the City treated the entire Class the same in its assessment and collection of impact fees, the Class is "sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News*, 737 F.3d 538, 545 (9th Cir. 2013). As such, adjudication of the constitutionality and legality of the City's impact fee framework will achieve judicial efficiency and economy on a Class-wide basis.

### A. The entire Class suffered the same harm and have the same claims arising from the same set of operative facts.

"The City imposes impact fees as part of the development approval process for *all* developments, remodels, and renovations." (Doc. 27 at 2 (emphasis added).) The City's development approval process was applied uniformly across the Class

and is the source of every operative fact giving rise to the claims asserted in this matter. With respect to the negligent misrepresentation claim, for example, as part of the development approval process, the City provides every building permit applicant an invoice of impact fees that must be paid *before* the City will issue a permit. (*See, e.g.,* Water & Wastewater Impact Fee Invoice for 754 Cottonwood Court attached hereto as Exhibit 3.) Inherent in such representations is the City's authority to prevent the proposed development if the applicant does not pay the required fees. Again, citizens must presume the City acts within its legal authority, so the fact that an applicant actually paid the impact fees is prima facie evidence that the applicant justifiably relied on the City's representation. The entire Class bore the cost of the challenged impact fees and suffered the same injury based on the City's negligent misrepresentations.

Likewise, the entire Class suffered the same negligence, negligence *per se*, and takings injuries caused by the City's failure to charge impact fee rates in accordance with Montana law and the Constitution. Again, all of the operative facts for these claims arose out of the same development approval process applied to every property owner who paid impact fees. The City said it best:

> Here, the [City's] impact fees derive from legislative ordinances that broadly apply to the general public seeking to develop their property. *See* § 7-6-1601, MCA, et seq.; WCC § 10-2-1, et seq; Resolutions [18-44 and 19-15]. *They are uniformly calculated based on a preset framework specified in the ordinances and Resolutions, rather than discretionary decisions for individual landowners.*

23

(Doc. 27 at 9 (emphasis added).)  The predominant issue common to the Class is whether that "preset framework" by which the City's water and wastewater impact fees "are uniformly calculated" complies with the constitutional and legal limitations placed on local governments assessing impact fees.  It is disingenuous to now suggest, with class certification on the line, that issues within that preset framework are individualized to certain Plaintiffs or Class members.

### B. There are no difficulties in managing the claims at issue on a Class-wide basis.

The City's own words explain why class certification in this matter is appropriate—in its impact fee rate determination and assessment, the City makes no "discretionary decisions for individual landowners."  (*Id.*)  Likewise, adjudication of this matter can occur on a class-wide basis because it requires no discretionary decisions for individual Class members.

When the government conditions land use permission on its receipt of property, it must provide analysis to justify that decision.  *Dolan*, 512 U.S. at 394-95.  The government carries the burden of demonstrating that the impacts of the proposed land use reasonably relate to what it exacts from the property owner.  *Id.*, at 395 ("[T]he city has not met its burden of demonstrating that the additional number of vehicle and bicycle trips generated by petitioner's development reasonably relate to the city's requirement for a dedication of the pedestrian/bicycle

pathway easement.").  Montana's impact fee statutes reflect this principle, requiring any local government charging impact fees to prepare a "service area report" in accordance with the criteria enumerated in § 7-6-1602.  These reports serve as the findings supporting the amounts a government can reasonably charge new development for impacts to its facilities, and its officials are to administer the fees in accordance therewith.  *Id.*  Here, all Class claims arise out of the City's findings for water and wastewater rate amounts and its non-discretionary administration of the fee rates.

To illustrate, Resolutions 18-44 and 19-15 contain impact fee collection charts setting out the City's water and wastewater impact fee rates since January 1, 2019.  (Doc. 40-1 at 3-4; Doc. 40-2 at 3-4.)  The bases for these charts are two documents entitled: (1) the "Impact Fee Update" issued August 7, 2018; and (2) the "Addendum to 'Impact Fee Update'" issued November 6, 2018 ("Update Addendum").[1]  (Doc. 76-1; Addendum to "Impact Fee Update" attached hereto as Exhibit 4.)  The Impact Fee Update was authored by FCS and was intended by the City to function as its service area report for charging impact fees.  The Update Addendum was authored by a City Staff member to addend the water fee section of FCS's original report.

---

[1] The Opposition misstates the facts, claiming that the Update Addendum prepared by a City Staff member was issued after January 1, 2019, and was not a basis for the City's impact fee rates until September 1, 2019.  (Doc. 75 at 34).  The Update Addendum was specifically referenced in Resolution 18-44, which was enacted on November 19, 2018.  (*See* Doc. 40-1 at 1).

The overarching goal of these two documents was to analyze features of the City's water and wastewater systems and determine "maximum defensible" impact fee rates the City could theoretically charge while meeting its obligations under the law. *See* (Doc. 76-1 at 9-10; Ex. 4 at 3.) A number of critical flaws in these documents resulted in inflated "maximum defensible" rates that, in turn, permeated Resolution 18-44's and Resolution 19-15's collection charts, causing unconstitutionally excessive impact fee rates in Whitefish. Except for the shower fixture unit issue which was a flaw in the City's administration of fees, each "individualized issue" referenced by the Opposition is a flaw in the reports supporting the City's impact fee rates. As such, resolving Plaintiffs' claims would identify maximum water and wastewater impact fee rates reflecting amounts reconcilable with the Constitution and Montana law.

For example, if it was unlawful for the City to consider the Solar Array project in determining impact fees, the project cannot be included in calculating lawful maximum wastewater rates. Comparing new, lawfully-calculated maximum wastewater rates with those in the City's collection charts demonstrates overcharges due to errors, such as the Solar Array's unlawful inclusion in the original calculations. Notably, some issues inflated both water and wastewater impact fee rates simultaneously—for example, the City's vast overestimation of the impacts an "equivalent residence unit" (indicated by the City's reports and collection charts as

a building in Whitefish with a 3/4-inch meter) has on its water and wastewater systems. (Doc. 76-1 at 11-20.)

Upon determining rates reflecting development's reasonably proportionate share of the water and wastewater facility costs incurred by the City, lawful impact fees charges could be calculated for each Class member (utilizing proper fixture unit weighting). Each class member's damages would then be measurable as the difference between what they actually paid in impact fees and what the City could have lawfully charged. Through discovery, the City has provided information on: (1) what each intended Class member paid; (2) the date impact fees were paid; (3) the address of each property for which impact fees were paid; (4) the size of water meter on each affected property; and (5) the planned fixture counts used by the City to determine impact fee charges for each affected property. In counting planned fixtures to determine impact fee charges, the City would use the building plans submitted to it as part of the development approval process. The City is still in possession of these plans. Thus, showing Class-wide injury is far from the "involved inquiry for each person" as argued by the Opposition. Calculating overcharges in the same exact way the City originally decided to charge impact fees is actually quite straightforward.

Here, the City carries the burden of demonstrating that the impacts of a proposed land use reasonably relate to what it exacts from the property owner.

*Dolan*, 512 U.S. at 395.  The factors within the City's impact fee calculations are "the findings on which the [C]ity relie[d]" for charges to a given development.  *Id.*, at 394-95.  Any suggestion by the Opposition that a more involved inquiry than the City's own method for calculating impact fees is required to prove Class-wide injury improperly seeks to shift the City's burden onto the Class.  For example, to show Class-wide injury, Plaintiffs cannot be required to unquestionably prove the fixtures *currently existing* on every single property at issue when the <u>City</u> determined the building plans were sufficient to make its findings in the original calculations.

Class-wide injury can be proven through showing the City's methods, as-applied to every Class member, did not reflect an essential nexus/rough proportionality finding on which it could reasonably rely.  Thus, there is sufficient cohesion to adjudicate liability and injury Class-wide, in furtherance of justice and judicial economy.

## V.   The Opposition's arguments against superiority and numerosity are disingenuous and meritless.

The Opposition advances multiple arguments with respect to superiority and numerosity, none of which are prevailing.

### A. The City's "voluntary resolution" of the fixture count issue is an inadequate remedy.

Improper fixture unit weighting is a small, but not insignificant, issue challenged by Plaintiffs in this lawsuit.  In the City's "ongoing, self-imposed refund

efforts" for fixture unit discrepancies, the City seeks to provide potential "refunds" to current property owners but only if the property owners agree to subject themselves to City inspections of their property.  (Doc. 75-12.) Setting the legal issues regarding who should receive any payments aside, the City's "efforts" have been ongoing for over a year and to Plaintiffs' knowledge "refunds" have yet to be made.  (*See* Whitefish Impact Fees Frequently Asked Questions attached hereto as Exhibit 5.)

If the City's inspection of the Weinbergs' property is any indication, the City's inspection and "refund" process is more retaliatory than remedial in nature. Somehow, after the City inspected the Weinbergs' property as part of this litigation, the City decided the Weinbergs actually owe it about $1,200 more in impact fees. There are many significant issues in the City's determination of undercharge to the Weinbergs, the most obvious of which is the City's identification of six extra fixture units it "did not know about" while failing to recognize such units would be offset by the three standalone showers (six extra fixture units) it overcharged them for.  *See* (Doc. 75-10.)   This highlights one of the many shortcomings with the City's "voluntary resolution" that is inadequate to even address the fixture unit issue alone.

**B. The City's administrative appeal process is inadequate for vindication of the Class's constitutional rights.**

Whitefish City Code ("WCC") § 10-2-6 does provide an exceptionally limited administrative appeal process for the City's impact fee charges which requires

payment of a fee before the payer is even "permitted" to appeal the amount.  §10-2-6(A).  However, almost every single Class member is now time-barred from availing themselves of the City's appeal process by not bringing a claim within WCC § 10-2-6(C)(2)'s 21-day "final bar to later seek review."

Further, there is nothing to suggest administrative appeal would do anything to change the City's position on the issues presented by this case.  The City reached a conclusive position on its impact fee rates and obligations to refund overcharges in September 2021, when City Council members declined to address most of Mr. Gillman's investigative findings.  "[A]dministrative 'exhaustion of state remedies' is not a prerequisite for a takings claim when the government has reached a conclusive position."  *Pakdel v. City and Cty. of S.F., Cal.*, ___ U.S. ___, ____, 141 S.Ct. 2226, 2231 (2021) (quoting *Knick*, 139 S.Ct. at 2167).  The City continues to maintain this position throughout this lawsuit.  Plaintiffs are not "attempting to bypass" anything, and by suggesting that an administrative appeal is somehow a superior method of resolving Plaintiffs' and the Class's claims, the Opposition "ignores the dominant characteristic of civil rights actions: they belong in court." *Burnett*, 468 U.S. at 50.

### C. Joinder of all Class members is impractical.

Even with eight extra individuals who paid fees under rates predating Resolution 18-44, Plaintiffs stated the correct Class size in their opening brief.  In

November of 2022, there were still over 350 Class members.  Since Plaintiffs' opening brief, the City identified at least thirty-five new properties for which water and/or wastewater fees were charged, up to January 25, 2023.  The size of the Class grows—more persons suffer constitutional injuries—day after day while the City continues to charge unlawful and unconstitutional impact fee rates.  It is impractical to join almost 400 individuals and entities, some of whom no longer reside in Whitefish or reside in Whitefish part-time.  This impracticality is intensified by the need to join parties on a rolling basis as more are harmed by the City's conduct.

As addressed in-depth in Plaintiffs' opening brief, the prospect of obtaining a relatively small recovery does not provide adequate monetary incentive for many Class members to subject themselves to the costs and responsibilities of litigation.  This does not mean each was not harmed, and escaping liability through avoiding class certification is exactly what the City is counting on.

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that the Court grant their class certification motion.

DATED this 7th day of April, 2023.

LAIRD COWLEY, PLLC

By:  /s/ Cory R. Laird
          Attorneys for Plaintiffs and
          Putative Class

KOVACICH SNIPES JOHNSON PC

By:  /s/ Mark M. Kovacich        
        Attorneys for Plaintiffs and
        Putative Class

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify that this brief is printed in a proportionally spaced Times New Roman text typeface of 14 points; is double-spaced; and word count calculated by Word is 6344, excluding the Caption, Table of Contents, Table of Authorities, Exhibit Index, and this Certificate of Compliance.

DATED this 7th day of April, 2023.

LAIRD COWLEY, PLLC

By:  /s/ Cory R. Laird            
        Attorneys for Plaintiffs and
        Putative Class

KOVACICH SNIPES JOHNSON PC

By:  /s/ Mark M. Kovacich        
        Attorneys for Plaintiffs and
        Putative Class